[No. 10604-7-III.    Division Three.    August 1, 1991.]

FARM CREDIT BANK OF SPOKANE, *Appellant,* v. TERRY A. TUCKER, ET AL, *Respondents.*

*Patrick F. Hussey* and *Velikanje, Moore & Shore,* for appellant.

*James Hayner* and *Minnick, Hayner & Zagelow,* for respondents.

THOMPSON, J. — Farm Credit Bank (FCB) appeals the Superior Court's order denying FCB interest on a summary judgment and decree of foreclosure of mortgaged property held by the Tucker family. The Tuckers cross-appeal, assigning error to the amount the court fixed as the upset price for the property. We reverse the court's denial of interest, but affirm the upset price.

In 1981, brothers Terry and Don Tucker and their spouses, with their four children and their spouses, purchased two dry-land wheat farms in Walla Walla County for $1,600,000. The farms were known as the Prescott and Rulo Farms and totaled approximately 2,300 acres. FCB appraised the parcels at $1,600,000 and loaned the Tuckers $1,120,000, evidenced by a promissory note

secured by a mortgage. Interest on the note was 11 percent per annum. The note further provided:

> The bank may, from time to time, establish a higher or lower rate of interest which shall then apply to the unmatured balance of the debt evidenced hereby . . . Such different rates shall be established in accordance with the provisions of the Farm Credit Act of 1971 and the regulations of the Farm Credit Administration as then existing. . . .
>
> All installments not made when due shall bear interest thereafter until paid at a default rate which is the rate from time to time in effect for this loan, plus two per cent per annum. If any default be made in any such installments, . . . then at the election of the holder of this note, without presentment or demand, the principal sum hereof and all accrued interest thereon shall become due and payable at once and the entire amount due and payable shall thereafter bear interest until paid at the default rate which was in effect at the time of acceleration.

The Tuckers made the annual payments on the note of $150,000 per year through 1986, but did not make their 1987 and 1988 payments.

In October 1988, FCB filed a complaint for judgment on the note and to foreclose the real estate mortgage. On March 27, 1989, FCB obtained an order of summary judgment. In April 1989, the parties stipulated to a summary judgment and decree of foreclosure. The judgment was for $1,418,915.05, together with interest at 14.25 percent per annum from August 16, 1988, "provided, however, that this amount shall be subject to such adjustments and set-offs as proven at the time of the sale confirmation hearing . . .". The court ordered the sale of the mortgaged property. The Tuckers then moved the court for a hearing to fix an upset price.

The trial court conducted a hearing in August 1989. Terry Tucker testified concerning the Tuckers' dealings with FCB, and the court admitted into evidence FCB's records detailing the meetings between the parties from 1986 to 1988. Both sides also presented expert testimony regarding the value of the parcels.

In findings entered in December 1989, the court held the fair value of the property for establishing an upset price was $956,400. It further found:

8. In February 1987, the Tuckers contacted the FCB and told the principals that they would be unable to make the March 1987 payment under the terms of the loan. The Tuckers offered to deed the property back to the FCB in lieu of foreclosure and offered to cooperate with the FCB in any manner possible. The Tuckers asked the FCB for the right to negotiate as a distressed buyer under the terms of the Agricultural Credit Act of 1987. The Tuckers offered to make partial payments on the land. The offer to deed in lieu of foreclosure, the offer to make partial payments, and the offer to negotiate under the Agricultural Credit Act were all refused by the FCB.

9. The FCB conceded that had a foreclosure been conducted in 1987, it would have been appropriate for the court to establish an upset price because of the local, regional and national state of the agricultural economy and the effect that the depressed wheat prices had.

. . . .

11. Had the FCB foreclosed in 1987, or had it accepted a deed in lieu of foreclosure, the deficiency owed by the Tuckers would have been minimal such that little or no interest would have accrued on the difference between the value of the land to be credited against the amount owed and the amount of the debt during the last thirty (30) months.

FCB does not assign error to the foregoing findings. Its assignments of error are to findings 21 and 23:

21. It is inequitable to require the Tuckers to pay prejudgment interest.

. . . .

23. It is inequitable to allow the FCB to accrue interest on the full principal balance of $1,094,329.50 [the amount due as of the Tuckers' default on March 1, 1987] from and after the winter of 1987 when the financial difficulty of the Tuckers was brought to the attention of the FCB and at which time the Tuckers made various offers to minimize their potential deficiency and the FCB's loss.

On December 15, 1989, the sheriff sold the property to FCB for the amount of the upset price. On February 12, 1990, the court entered an order disallowing interest from May 17, 1987, until April 14, 1989, the date of the

summary judgment and decree of foreclosure. The court further ordered that the summary judgment would not accrue postjudgment interest. Disallowing interest, the judgment was for $1,268,518.65. The court entered a judgment for a deficiency over the upset price of $256,118.65, which sum the Tuckers paid to the registry of the court on February 16, 1990.

## FCB's Appeal

FCB contends the interest provided for in the promissory note is recoverable as a matter of right. The Tuckers argue foreclosure is an equitable action. Thus, a court, acting in equity, can disallow interest on equitable grounds. Alternatively, the Tuckers argue the damages awarded in the summary judgment and decree of foreclosure were unliquidated; until the court fixed the upset price for the mortgaged property, the amount of the deficiency judgment was uncertain. Only liquidated claims, or those ascertainable by computation, accrue prejudgment interest, which is assessed as damages for the withholding of the amount due. *Mall Tool Co. v. Far West Equip. Co.*, 45 Wn.2d 158, 169, 273 P.2d 652 (1954).

The Tuckers have confused FCB's contract right to interest with prejudgment interest which is claimed as damages. In the latter situation, no agreement to pay interest exists, but interest is awarded as damages to compensate the plaintiff for the loss of use of the money. *Washington State Hop Producers, Inc. v. Goschie Farms, Inc.*, 112 Wn.2d 694, 773 P.2d 70 (1989); *Hansen v. Rothaus*, 107 Wn.2d 468, 473, 730 P.2d 662 (1986). The court has the authority to disallow interest on equitable grounds only if the interest claimed is prejudgment interest.

The rule is that

"[w]here interest is claimed as damages, *and not by reason of any contract therefore*, it will not be allowed if the delay in the payment of the principal debt is the result of the neglect of the creditor to demand and enforce such payment."

(Italics ours.) *Safeco Ins. Co. of Am. v. Watertown*, 538 F. Supp. 49, 52 (D.S.D. 1982) (quoting *State v. Platte Vly. Pub. Power & Irrig. Dist.*, 143 Neb. 661, 10 N.W.2d 631, 634 (1943)). *Platte* relied upon *Redfield v. Ystalyfera Iron Co.*, 110 U.S. 174, 176, 28 L. Ed. 109, 3 S. Ct. 570, 572 (1884), which stated:

> Interest is given on money demands as damages for delay in payment, being just compensation to the plaintiff for a default on the part of his debtor. *Where it is reserved expressly in the contract*, or is implied by the nature of the promise, *it becomes part of the debt, and is recoverable as of right*; but when it is given as damages, it is often matter of discretion. . . . But where interest is recoverable, not as part of the contract, but by way of damages, if the plaintiff has been guilty of laches in unreasonably delaying the prosecution of his claim, it may be properly withheld.

(Italics ours.) Here, FCB claims interest as a result of its contract with the Tuckers, as set forth in the promissory note. Thus, the court erred when it disallowed interest on equitable grounds.

In so holding, we reject the Tuckers' assertion that FCB's foreclosure action was wholly equitable in nature and unaffected by the provisions of the parties' promissory note.[1] The Tuckers are not aided by their reliance upon RCW 61.12.120. That statute bars a plaintiff from foreclosing "while he is prosecuting any other action for the same debt or matter which is secured by the mortgage . . .". RCW 61.12.120. It does not prevent a plaintiff from pleading the terms of a note in a foreclosure action. *Hinchman v. Anderson*, 32 Wash. 198, 206, 72 P. 1018 (1903). Such a plaintiff simply agrees to pursue recovery of the judgment from the sale of the foreclosed property *before* levying on any other property of the debtor to satisfy a deficiency. *See* RCW 61.12.070, which provides:

---

[1]The Tuckers cite *Puget Sound Nat'l Bank v. Olsen*, 174 Wash. 200, 202, 24 P.2d 613 (1933). *Olsen* does *not* stand for the proposition that once a plaintiff decides to seek foreclosure, the plaintiff abandons all rights in contract. It merely holds that since the foreclosure action raises a question of equitable cognizance, the plaintiff is not entitled to a jury trial as a matter of right. *Olsen*, at 202.

> When there is an express agreement for the payment of the sum of money secured contained in the mortgage or any separate instrument, the court shall direct in the decree of foreclosure that the balance due on the mortgage, and costs which may remain unsatisfied after the sale of the mortgaged premises, shall be satisfied from any property of the mortgage debtor: . . ..

*See also Codd v. Von Der Ahe*, 92 Wash. 529, 533, 159 P. 686 (1916).

■ We also reject the Tuckers' alternative argument that FCB's claim was unliquidated until the court fixed the upset price. The credit for the price obtained in a foreclosure sale is comparable to the offset of an amount obtained in a counterclaim by the debtor. As stated in *Mall Tool Co.*, at 177:

> An unliquidated counterclaim, even when established, does not affect the right to interest prior to judgment on the amount found to be due on a liquidated or determinable claim, since the debtor may not defeat the creditor's right to interest on such a claim by setting up an unliquidated claim as a set-off.

Finally, we note that even if the rule disallowing prejudgment interest on equitable grounds was applicable, the evidence does not support the court's findings relative to the equities here. In *Getty Oil Co. v. Catalytic, Inc.*, 509 A.2d 1123, 1126 (Del. Super. Ct. 1986), the court stated:

> [D]elay such as will suspend the running of prejudgment interest is either (1) *a failure by the plaintiff or his attorney to take some action in the prosecution of a case at a time that would otherwise seem appropriate to a reasonable person* or attorney, or (2) the taking of some action by the plaintiff or his attorney that bears absolutely no reasonable relation to the prosecution of the case or is otherwise impermissible.
> . . . [N]o element of bad faith is necessary.

(Italics ours.) The question presented is whether the evidence shows FCB unreasonably delayed when it waited until October 1988 to begin foreclosure proceedings.

Terry Tucker testified they offered to deed the property to FCB in lieu of the indebtedness in May 1987, and they

were willing to consider paying FCB something in addition. FCB's records indicate that at a meeting with the Tuckers on October 7, 1987, the parties disagreed on the value of the property for a possible deed in lieu of foreclosure and, therefore, decided to have the property appraised. In February 1988, that appraisal came in at $790,000. In March 1988, the Tuckers again met with FCB officers to discuss a restructure of the loan. As in the past, FCB's position was that additional collateral was needed for a restructure. FCB rejected a proposal for a restructure submitted by the Tuckers' attorney in late March. Exhibit 12 also reflects FCB discussed an in-house proposal in May 1988 to resolve the loan, but the proposal was rejected and was never presented to the Tuckers. FCB rejected a second proposal submitted by the Tuckers' attorney in June 1988.

It is evident the parties continued negotiations during 1987-1988. While the Tuckers emphasize the fact FCB made no serious counteroffers to their proposals to resolve the loan account, the lack of a counteroffer is not proof FCB unreasonably delayed filing its foreclosure action. The situation here differs substantially from the delay which justified denial of prejudgment interest in *Getty* and *Safeco Ins. Co. of Am. v. Watertown, supra.* In *Getty,* the plaintiff filed briefs late and did not respond to discovery requests until ordered by the court to do so. *Getty,* at 1127. In *Safeco,* the delay was caused by the plaintiff's repeated requests for continuances. *Safeco,* at 52. Here, the Tuckers actively negotiated for an alternative to a foreclosure proceeding, and were as responsible for the delay as FCB. What the Tuckers' argument seeks to establish is bad faith on the part of FCB. However, even the trial court refused to find FCB acted in bad faith, and recent case law holds banks have no duty to cooperate apart from the performance of specific contract terms. *Badgett v. Security State Bank,* 116 Wn.2d 563, 570, 807 P.2d 356 (1991).

We therefore hold the trial court erred when it denied FCB interest on the loan from May 1987.

THE TUCKERS' CROSS APPEAL

The Tuckers contend the trial court abused its discretion when it fixed the upset price for the property at $956,400.

RCW 61.12.060 provides in part:

> The court, in ordering the [foreclosure] sale, may in its discretion, take judicial notice of economic conditions, and after a proper hearing, fix a minimum or upset price to which the mortgaged premises must be bid or sold before confirmation of the sale.

██ In fixing an upset price, the trial court assumes the position of a competitive bidder, considering

> the state of the economy and local economic conditions, the usefulness of the property under normal conditions, its potential or future value, the type of property involved, its unique qualities, if any, and any other characteristics and conditions affecting its marketability along with any other factors which such a bidder might consider in determining a fair bid for the mortgaged property.

*National Bank of Wash. v. Equity Investors*, 81 Wn.2d 886, 926, 506 P.2d 20 (1973). *See also Lee v. Barnes*, 61 Wn.2d 581, 586-87, 379 P.2d 362 (1963). The decision to fix an upset price, and the price itself, are matters within the court's sound discretion. *American Fed. Sav. & Loan Ass'n v. McCaffrey*, 107 Wn.2d 181, 188-89, 728 P.2d 155 (1986); *Equity Investors*, at 926-27.

The testimony relating to the above considerations includes the following: David Auble appraised the property for the Tuckers in 1989. He used the market comparison approach. He found very few sales of comparable farmland, which he stated is an indication of a depressed market. The price of wheat had been down which meant less capital was available. Nevertheless, in his judgment, prices had turned the corner. He anticipated a stronger market, beginning the fall of 1989.

Mr. Auble valued the farms using a price per bushel analysis. Based upon what he believed were comparable sales, he was of the opinion buyers had been purchasing comparable farmland at a per acre rate of between $8 to $10 per bushel, multiplied by the number of bushels typically yielded per acre. For example, if a comparable sale was for $500 per acre, and the yield for that property was 50 bushels per acre, then the price per bushel paid for the land would be $10. Using this analysis, he calculated the value of the property at the time of the hearing was $1,065,800. He testified that value did not reflect the value of the land under normal conditions. Since wheat prices had been higher the past 2 years, he was of the opinion farm values would follow suit shortly. Looking at the history and the trends over the past 20 years, he estimated the fair value of the property under normal conditions to be $1,283,200. He expected normal conditions within a year or so.

Gregory Perry, assistant professor of agricultural resources at Oregon State University, testified to a statistical relationship between the values of farmland in the area and the returns that farmland generated. He forecast the value of the lands in question in 1989 as being $508 per acre for the Prescott farm and $473 per acre for the Rulo farm. This compared to the $500 per acre estimated by Mr. Auble. In 1990, he forecast an increase in value to $627 per acre for the Prescott farm and $584 per acre for the Rulo farm.

J.P. "Jack" Fredrickson appraised the property at FCB's request. In his opinion, the typical buyer looks at a 10-year average on yields. Mr. Fredrickson stated Mr. Auble's estimated yields for the property were too high. Considering what he believed were comparable sales, Mr. Fredrickson valued the properties at $790,000.

Agricultural consultant James Fitch also testified on behalf of FCB. While he stated that farm prices in Walla Walla County had bottomed out, he was of the opinion the current situation was different from the early 1970's

when farm prices skyrocketed. He saw a lot more caution. Government price supports were being decreased. In his view, it would be a long time before land values recouped what they were in the early to mid-1980's.

The court found:

16. There is evidence that the economic slump and depression in the price of agricultural commodities, particularly wheat, may have started to get better. There is some evidence that the value of farmland should start to increase in the future.

17. The evidence demonstrates that the price of soft white winter wheat, which is the primary crop grown on the land mortgaged to the FCB by the Tuckers, has increased from a low of approximately $2.35 per bushel to over $4.00 in 1988 and 1989.

18. There is evidence that the price of soft white winter wheat should not decrease drastically in the next several years. Based upon the price of the last several years and the likelihood of a stable price in the near future, it is likely the value of farmland of the kind being foreclosed will increase in the future.

19. Although it is impossible to make forecasts, there is evidence that the value of the farmland could rise by up to 25% in the next several years.

20. There is evidence that the fair value of the property could be as high as $1.3 million or $1.4 million, taking into consideration the usefulness of the property under normal conditions, the state of the economy and local economic conditions, the potential of the future value of the property, the type of property involved, the characteristics and conditions affecting the marketability of the property, the potential future economy, and other factors.

. . . .

22. This court finds that the fair value of the property for purposes of establishing an upset price is $956,400.00.

First, the Tuckers contend the court erred in setting the upset price below Mr. Auble's opinion of fair value. They assert Mr. Auble was the only witness who considered all the factors set forth in *Lee* and gave an opinion as to "fair value", as opposed to "fair market value". These arguments are not persuasive. Each witness need not testify to every factor. Here, FCB's witnesses disputed certain portions of Mr. Auble's testimony. The court was free, in its discretion and as the trier of fact, to use the testimony of

FCB's witnesses to discount Mr. Auble's estimate of fair value.[2]

■ Second, the Tuckers argue that the upset price was error because it was equal to the assessed valuation of these properties. "It is settled that assessed value is not to be considered in determining fair market value." *McClure v. Delguzzi*, 53 Wn. App. 404, 408, 767 P.2d 146 (1989) (citing *American State Bank v. Butts*, 111 Wash. 612, 191 P. 754, 17 A.L.R. 168 (1920)). In *McClure*, the trial court erroneously relied exclusively on assessed value as " 'the only indication of fair market value that is not impeached.' " *McClure*, at 407. Here, the trial court had before it two appraisals, and the testimony of two agricultural experts. The upset price is within the range of the testimony. Unlike *McClure*, there is no indication the trial court relied on assessed value when it fixed the upset price.

We hold the court did not abuse its discretion when it fixed the upset price at $956,400.

## ATTORNEY FEES

Both parties have requested fees on appeal, pursuant to the terms of the promissory note, which provided: "In case of suit hereon or foreclosure, the makers hereof agree to pay a reasonable attorney's fee in addition to other costs."

■ RCW 4.84.330 states that a contract containing an attorney fee provision entitles the prevailing party in an enforcement action to recover reasonable attorney fees and costs. The language is mandatory; no discretion is allowed as to *whether* fees should be allowed. The only discretion is to the *amount*. *Singleton v. Frost*, 108 Wn.2d 723, 729-30, 742 P.2d 1224 (1987). Here, FCB is the prevailing party. We therefore grant FCB reasonable

[2]The Tuckers point out Mr. Fredrickson admitted in cross examination that his appraisal was of the fair market value of the property, and not "fair value" for purposes of fixing an upset price. However, this "admission" must be read in the context of his entire testimony. In his opinion, conditions affecting the marketability of the property did not warrant fixing a fair value above the fair market value.

attorney fees on appeal. FCB shall file an affidavit of fees within 10 days of the filing of this opinion. RAP 18.1(d).

The judgment of the Superior Court fixing the amount of the upset price is affirmed. The judgment denying FCB interest is reversed.

GREEN, C.J., and MUNSON, J., concur.

Review denied at 118 Wn.2d 1001 (1991).